**FEDERAL TRADE COMMISSION,**
Petitioner,

v.

David ROCKEFELLER, Chairman, and the Chase Manhattan Corporation,

Donald C. Platten, Chairman, and Chemical New York Corporation,

Walter B. Wriston, Chairman, and Citicorp,

Roger E. Anderson, Chairman, and Continental Illinois Corporation,

James H. Higgins, Chairman, and Mellon National Corporation,

E. C. Patterson, Chairman, and J. P. Morgan & Co., Inc., Respondents.

**FEDERAL TRADE COMMISSION,**
Petitioner,

v.

A. W. CLAUSEN, President, and Bank America Corporation, Respondents.

Nos. 76 Civ. 1826, 76 Civ. 1827.

United States District Court,
S. D. New York.

Nov. 23, 1977.

Robert J. Lewis, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, Warren S. Grimes, F.F.C., Washington, D. C., for the F. T. C.

Wilmer, Cutler & Pickering, Washington, D. C., and Bela Szathmary, Ralph J. Aiello, Bank of America N.T. & S.A., New York City, for respondents A. W. Clausen, President, and BankAmerica Corp.; Arnold M. Lerman, Gary D. Wilson, Robert G. Wilson, Washington, D. C., of counsel.

236

Cravath, Swaine & Moore, New York City, for respondents Donald C. Platten, Chairman, and Chemical New York Corp.; Ralph L. McAfee, Richard S. Simmons, Steven C. Schroer, New York City, of counsel.

Shearman & Sterling, New York City, for respondents Walter B. Wriston, Chairman, and Citicorp; John E. Hoffman, Jr., Herman E. Compter, Francisca A. Sabadie, New York City, of counsel.

Mayer, Brown & Platt, Chicago, Ill., White & Case, New York City, for respondents Roger E. Anderson, Chairman, and Continental Illinois Corp.; Miles G. Seeley, John Bleveans, Thaddeus J. Marciniak, Chicago, Ill., Rayner M. Hamilton, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for respondents E. C. Patterson, Chairman, and J. P. Morgan & Co., Inc.; Taggart Whipple, Steven F. Goldstone, Henry H. Korn, New York City, of counsel.

Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for respondents James H. Higgins, Chairman, and Mellon Nat. Corp.; Joseph A. Katarincic, David L. Feigenbaum, Pittsburgh, Pa., of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for respondents David Rockefeller, Chairman, and the Chase Manhattan Corp.; Edward J. Reilly, Kenneth A. Perko, Jr., New York City, of counsel.

LASKER, District Judge.

The Federal Trade Commission ("FTC") moves for enforcement[1] of seven subpoenas *duces tecum*, which were issued to the respondent bank holding corporations ("banks") in June, 1975. The banks resist enforced compliance, contending—sometimes by way of affirmative defense, other times, by counterclaim—that: (1) the FTC lacks the authority to issue the subpoenas, (2) whether or not authority exists, the subpoenas call for the production of irrelevant material, and (3) the subpoenas are unduly burdensome.[2] The motion is granted subject to the conditions set forth below.

In 1973, Congress directed the FTC to conduct a comprehensive study of the structure and function of the energy industry.[3] Pub. L. No. 93–135, 87 Stat. 468 (1973); *Agriculture, Environmental, and Consumer Protection Appropriation—1974*, Conference Report No. 93–520 on H.R. 8919, at 24. On April 16, 1974 and again on September 12, 1974, the FTC, responding to the Congressional directive, promulgated a series of resolutions, which authorized the use of compulsory process to aid in the acquisition of

1. Section 9 of the FTC Act, 15 U.S.C. § 49, authorizes the district courts to command compliance with subpoenas issued by the Commission.

2. These are the main objections. Other miscellaneous grounds for resisting the subpoenas are offered by certain respondents and are discussed below at 242–244. Two banks, Chase and Morgan, assert counterclaims under the Freedom of Information Act, demanding the release of information in the hands of FTC that might shed light on the proper interpretation of the 1973 Amendment to 15 U.S.C. § 46 and, also, of information that was submitted to the Commission in opposition to the original motions to quash (which were heard by the Commission). The FTC has moved to strike, or, in the alternative, sever these counterclaims. Their motion to strike is discussed, *infra*, at 244.

3. The Conference Report on the bill that included the appropriations for the energy study provided, in pertinent part, as follows:

"FEDERAL TRADE COMMISSION

"Amendment No. 71: Appropriates $30,600,000 instead of $29,600,000 as proposed by the House and $32,090,000 as proposed by the Senate. The conference agreement includes $1,000,000 for a study of the energy industry. This study shall be in conjunction with the study made heretofore which was limited to the petroleum industry and shall include a report to the Committee and to the Congress at the earliest practicable moment consistent with compiling an adequate study. As in the earlier petroleum study, the study should also include consideration of the effects of decisions by government departments and agencies, including environmental agencies, on the price and supply of energy . . . ."

Congress effectively renewed authorization for the study in 1974 by appropriating funds sufficient to carry the investigation through fiscal 1975. Pub. L. 93–563, 88 Stat. 1840–41 (1974).

information about the energy industry.[4] In particular, the FTC was concerned about the existence and effect of interlocking relationships between the petroleum industry and the financial sector (see, Resolution of September 12). On June 10, 1975, following the release of the resolutions, the FTC issued subpoenas *duces tecum* to nine banks.[5] In July, the respondent banks filed motions to quash (BankAmerica did not file its motion until November). The gist of the banks' resistance was then, as it is now, that the subpoenas had been issued in excess of the FTC's authority, that they were concerned with the divulgence of irrelevant material, and that they imposed undue burdens on the banks. The Commission considered the objections and ruled, on August 21, 1975, that the FTC had authority to issue the subpoenas and that the documents requested were relevant to the energy study[6] (the ruling with respect to BankAmerica's motion was made on March 2, 1976). In response to the objections that the subpoenas were unduly burdensome, the Commission narrowed certain of the specifications (see, the Composite Subpoena, *infra*, n.11, incorporating the August 21, as well as other, modifications). Finally, the Commission instituted protective provisions for the purpose of guarding information that the respondents claimed was confidential (see, *infra*, n.12). September 12, 1975 was set down as the return date for the modified subpoenas directed at Chase, Chemical, Citicorp, Continental, Mellon, and Morgan. When these respondents failed to appear, the FTC filed a petition for enforcement, 15 U.S.C. § 49, in the District Court for the District of Columbia. And, in March, 1976, when BankAmerica indicated that it would

---

**4.** On April 16, 1974, the FTC promulgated three identical resolutions concerning the investigation of the natural gas, coal and nuclear energy industries:

"Nature and Scope of Investigation:

"To obtain information on all pertinent aspects of the structure, conduct and performance of the [natural gas, coal and nuclear energy] industry, including reserve ownership, exploration, production, transportation, and marketing and distribution practices, and all related matters, for the purpose of the development of a comprehensive study of the energy industry and a report thereof to Congress pursuant to P.L. 93–135; it being understood that any such information received pursuant to compulsory process which pertains to possible violations of Section 5 of the Federal Trade Commission Act and/or Sections 7 and 8 of the Clayton Act may be utilized in conducting specific investigations thereof.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

Authority to conduct investigations: Sections 6, 9 and 10 of Federal Trade Commission Act, 15 U.S.C. 46, 49, 50; FTC Procedures and Rules of Practice, 16 CFR 1.1 et. seq. and supplements thereto."

On September 12, 1974, the Commission resolved that compulsory process might be used to explore the interlocking relationships between the petroleum industry and the financial sector:

"Nature and Scope of Investigation:

To determine the extent and effects of direct and indirect interlocking directorates, and other interlocking personnel and business relationships among domestic petroleum companies and between such companies and financial institutions and to determine whether or not such interlocking relationships may be in violation of Section 8 of the Clayton Act or may result in unfair methods of competition or unfair acts or practices within the meaning of Section 5 of the Federal Trade Commission Act.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation.

Authority to Conduct Investigation:

Sections 6, 9, and 10 of Federal Trade Commission Act, 15 U.S.C. 46, 49, 50; FTC Procedures and Rules of Practice, 16 C.F.R. 1.1, et seq. and supplements thereto."

**5.** They were: BankAmerica Corp. ("BankAmerica"); Chase Manhattan Corp. ("Chase"); Chemical New York Corp. ("Chemical"); Citicorp; Continental Illinois Corp. ("Continental"); First City Bankcorp of Texas ("First City"); Mellon National Corp. ("Mellon"); J. P. Morgan & Co., Inc. ("Morgan") and Security Pacific Corp. ("Security").

**6.** Letters were sent to each respondent, and each letter contained slightly different modifications (since in their motions to quash, the respondents had lodged different objections to the specifications). *On the questions of authority, relevance, and burdensomeness,* the letters were identical: authority was found in 15 U.S.C. § 46, the information requested was adjudged to be "relevant and necessary," and the burden imposed was held to be not undue.

not comply with its modified subpoena, a similar petition was filed. The two proceedings were consolidated and transferred to this district.

## I.

In both the April and September resolutions (by which the FTC authorized the use of compulsory process), the Commission indicated that its authority to "conduct the investigation" could be found in §§ 6, 9, and 10 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50.[7]

In their earlier motions to quash, the respondents charged that the subpoenas were part of an attempted investigation of the banking industry. It was said that such an investigation must fail because the FTC is specifically prohibited from exercising its regulatory and investigative jurisdiction over banks, 15 U.S.C. §§ 45(a)(6), 46, and that the subpoenas were therefore invalid. The Commission's August 21 opinion letter, which disposed of the motions to quash, resolved the question of authority by referring exclusively to § 6 of the Act, 15 U.S.C. § 46. As is apparent from the following language of the Commission's ruling, the FTC, at least provisionally, accepted the respondents' self-serving characterization of the inquiry, and rose to the challenge (which might be considered a diversion) that the FTC lacked the authority to *investigate* banks:

"2. The Trans-Alaska Pipeline Authorization Act, Pub.L. 93–153, 87 Stat. 576 (1973) amended Section 6 of the Federal Trade Commission Act (15 U.S.C. § 46) to provide that the Commission may investigate banks 'to the extent that such action is necessary to the investigation of any . . . industry which is not engaged . . . in banking.' The amendment grants the Commission investigatory jurisdiction over banks with regard to all subjects 'necessary' to the resolution of issues in an investigation of an industry

not engaged in banking. The effect of the amendment is to define the permissible scope of an investigation touching on banks and to require that the subject matter of such an inquiry arise out of a matter properly under investigation . . . in this instance, competitive conditions in the energy industry." (Letter of August 21, at 3–4)

*Section 9 of the Act, 15 U.S.C. § 49, which covers the narrow question of when subpoenas may issue, and against whom they may properly run, was not mentioned by the Commission.* Instead, battle was pitched on the broad question of the FTC's right to conduct an investigation of the banking industry. Thereafter, in the welter of legal memoranda that followed, as well as in the course of hearings and conferences, the attention of all was particularly directed to the meaning of 15 U.S.C. § 46 (as it had been recently amended), and the FTC pressed its case on two fronts. First, they argued that the specific exemption of § 46 did not apply to bank holding companies (as opposed to banks), and that therefore, the plenary investigative power of the FTC could be levelled at the respondents (it was in the spirit of this belief that the FTC had earlier changed the original subpoenas so that the respondents would be denominated as "bank holding companies" rather than—as they had originally been named— "banks"). What followed was a lengthy exploration of the legislative history of the FTC Act, none of which was illuminating on a question that had acquired burning importance for both sides: whether, in 1914 —when the Act was passed—Congress meant to distinguish bank holding companies from banks, and subject the former to the FTC's jurisdiction, while shielding the latter. Second, the FTC contended that even if bank holding companies were to be regarded as banks, or if the subpoenas were construed as being directed in fact at their bank subsidiaries, both bank holding companies and banks were answerable to the

---

7. The pertinent parts of 15 U.S.C. §§ 46, 49 are set forth below at pp. 239 and 240. Section 50 is omitted, since it deals not with proper range of the FTC's investigatory authority, or its

exercise, but with offenses and penalties related to refusal to comply with an authorized FTC subpoena.

Commission's subpoena power if either had information that was "necessary" to the prosecution of any authorized investigation. The authority to conduct such an ancillary investigation of the banks was found in the proviso to § 46 (as amended). This second contention raised a storm of controversy over the meaning of "necessary."

The consequence of this contorted and lugubrious history has been that the case was presented by both parties to the court as if the predominant issue were the meaning of the term "necessary" in the Trans-Alaska Pipeline Authorization Act (amending 15 U.S.C. § 46). That is, in the course of the battle over § 46, the question of the effect of the provisions of 5 U.S.C. § 49 all but disappeared from the scene. On reflective examination of the papers, however, it appears that the provisions of § 49 are dispositive.

Rather than further rehearse the details of the presentation that was made to the court, or account for the startling lack of emphasis that was placed on the most pertinent statutory provision, we take this opportunity to clear the air.

The issue in this case is whether the FTC has authority to subpoena documents from banks, not whether the FTC has authority to *investigate* banks. In this regard, the attention devoted to § 46, which describes the FTC's investigative authority, and creates special tools for the exercise of that authority, has been misdirected. Section 46, "Additional powers of Commission" provides as follows:

"The Commission shall also have power—
. . .

(a) To gather and compile information concerning, and to investigate from time to time . . . any person . . . engaged in or whose business affects commerce, excepting banks . . . , and its relation to other persons . . .

(b) To require, by general or special orders, persons . . . engaged in or whose business affects commerce, excepting banks . . . to file with the Commission in such form as the Commission may prescribe annual or special . . reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other . . . [persons] . . . of the respective persons . . . filing such reports or answers in writing.

\* \* \* \* \* \*

*Provided,* That the exception of 'banks' . . . from the Commission's powers defined in clauses (a) and (b) of this section, shall not be construed to limit the Commission's authority to gather and compile information to investigate, or to require reports or answers from, any person . . . to the extent that such action is necessary to the investigation of any person . . . which is not engaged or is engaged only incidentally in banking . . ." 15 U.S.C. § 46.

None of the special reporting devices authorized by § 46 is being used here, and whether the terms of § 46 might uphold the issuance of subpoenas in cases where § 49 did not is a question that need not be determined, since § 49 amply supports the issuance of the contested subpoenas in this case.[8]

---

8. The respondents contend that the issuance of these subpoenas amounts, in fact, to an attempted investigation of the banks. The "true" purpose of the investigation is of course defined not by the banks' characterization nor the FTC's, but by the scope of the subpoenas themselves. In weighing the banks' argument that the inquiry is something other than it seems, and not what the FTC says it is (a *study of the energy* industry), the court does nothing more or less than examine the *rele-* vance of the requested information—*that*, not the assurances of the parties, is what demonstrates the purpose. Put another way, to say that the FTC is, in fact, investigating banks is to say that the specified materials bear no relation to the energy industry. That is a contention that is readily resolved, and if it is found that the information is relevant to the industry, the fact that it might also shed some light on the banks does not compromise the propriety of the investigation.

## II.

*Court Review in a § 49 Enforcement Proceeding*

■ The court's role in an enforcement proceeding is limited. Compliance must be ordered if, and only if, "the inquiry is within the authority of the agency [issuing the subpoena], the demand is not too indefinite [so that it amounts to an unreasonable burden] and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950); *accord, Oklahoma Press Publishing Co. v. Walling,*[9] 327 U.S. 186, 209, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Applying *Morton Salt's* test, we find that authority and relevance have been established, but that the issue of burdensomeness is not fully resolved and precludes immediate enforcement.

*Authority to Inquire of the Banks*

■ The FTC's authority to conduct an investigation of the energy industry is undisputed. What is disputed is its authority to subpoena the banks in the course of such an investigation. The banks contend that because they are exempt from the jurisdiction of the FTC, they are not within the FTC's subpoena power. (Joint Reply Brief at 16)

In pertinent part, 15 U.S.C. § 49 provides that:

" . . . the Commission . . . shall . . . have access to, for the purpose of examination, and the right to copy any documentary evidence of any person . . . being investigated or proceeded against; *and the Commission shall have power to require by subpoena . . . the production of all such documentary evidence relating to any matter under investigation.*" (emphasis supplied)

The banks argue that § 49 authorizes the use of subpoena only against those who—unlike the banks in this case—are the subject of a proper FTC investigation or proceeding. Their reading of § 49 was rejected so clearly in *FTC v. Tuttle*, 244 F.2d 605, 615 (2d Cir. 1957) (the Court read the word "such," which appears in the clause following the semi-colon, out of the statute); *accord, United States v. Marshall Durbin & Co. of Haleyville, Inc.*, 363 F.2d 1, 5 (5th Cir. 1966); *FTC v. Harrell*, 313 F.2d 854, 856 (7th Cir. 1963), that its reassertion here is remarkable. Moreover, although neither side has briefed the point, the subpoena power of § 49 extends not only to those who are not targets of an investigation, but also to those who, because of an exemption such as is enjoyed by these respondents, can never be targets. *FTC v. Cockrell*, 431 F.Supp. 561, 563, 564 (D.D.C.1977); *Freeman v. Brown Brothers Harriman & Co.*, 250 F.Supp. 32, 34 (S.D.N.Y.1966), *aff'd*, 357 F.2d 741 (2d Cir.), *cert. denied*, 384 U.S. 933, 86 S.Ct. 1446, 16 L.Ed.2d 532 (1966); *Freeman v. Fidelity-Philadelphia Trust Company*, 248 F.Supp. 487, 492 (E.D.Pa.1965).[10]

■ We find, therefore, that 15 U.S.C. § 49 gives the Commission authority to command information from the banks in connection with its lawfully authorized study of the energy industry.

*Relevance*

■ As mentioned earlier, an administrative agency's authority to issue a subpoena does not establish the instrument's propriety. The information requested by the subpoena must be relevant to the legitimate purpose of the issuing agency, and, in this case, relevance is measured by comparing the specifications of the subpoenas with the

---

**9.** *Oklahoma Press* involved the Fair Labor Standards Act, which incorporated the subpoena provisions of the Federal Trade Commission Act. 327 U.S. at 220, n. 24, 66 S.Ct. 494.

**10.** The two *Freeman* cases were brought under the Agricultural Marketing Agreement Act, which incorporated the Federal Trade Commission's subpoena provisions.

resolutions of the Commission, which announced the purpose and scope of the inquiry. See, e. g., *FTC v. Gibson*, 460 F.2d 605, 609 (5th Cir. 1972). If the comparison establishes that the specified requests "may be relevant" to the legitimate inquiry of the FTC, compliance must be ordered (provided the information requested does not place an undue burden on the respondents, see, *infra*, at 13). *SEC v. Wall Street Transcript Corporation*, 422 F.2d 1371, 1375 (2d Cir. 1971); *cert. denied*, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970); *accord, SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047, 1053 (2d Cir. 1973); *United States v. Acker*, 325 F.Supp. 857, 862 (S.D.N.Y.1971); *FTC v. Green*, 252 F.Supp. 153, 155–56 (S.D.N.Y. 1966).

The Commission itself takes the view that the documents sought are relevant, even necessary, to the investigation of the energy study (see letter of August 21 at 3, 4), and that view must be respected. *FCC v. Cohn*, 154 F.Supp. 899, 906–07 (S.D.N.Y. 1957). Examination of the subpoenas leads us to conclude that the Commission's appraisal of relevance is correct, and that the materials requested are certainly relevant to the stated purpose of the investigation.

That purpose is set forth in the September 12, 1974 resolution:

"To determine the extent and effects of direct and indirect interlocking directorates, and other interlocking personnel and business relationships among domestic petroleum companies and between such companies and financial institutions and to determine whether or not such interlocking relationships may be in violation of § 8 of the Clayton Act or may result in unfair methods of competition or unfair acts or practices . . . "

See, also, letter of August 21 at 4. Turning now to the subpoena itself,[11] specifications 1, 2, 3(a) and 3(b) cull general information about the operating structure of the bank. They provide for a description of the vertical and horizontal subdivisions, as it were, of the respondent holding companies, as well as the names of those with key positions in the various units. This information may show the connection, if any, that an interlocked director has with the credit departments and policy making divisions of the banks. Understanding the structure and operation of such connections is essential to determining whether the interlock allows certain energy companies to achieve an undue advantage over competitors. Specification 3(c) asks for a:

"statement of goals, strategies, plans of action for the growth, performance and development of your bank during the subpoena period to the extent that they apply to or affect the energy departments."

This background information is clearly relevant to the stated purpose of the inquiry. Specifications 4–9 (inclusive) explore the policy and practice of each bank (if any) as to the selection of officers of energy companies as members of its Board of Directors, as well as appointment of its own officers to the boards of energy companies. By studying the process by which prospective board members have been screened and the factors that have contributed to their selection or rejection, the FTC may learn whether the formation of the interlocking relations was part of a violative design. Specifications 11, 12 and 13 bear on the banks' general credit policies toward energy companies and the manner in which such policies are implemented. In conjunction with Specifications 10, 14, and 15, which explore specific policies towards named, "interlocked" energy companies, 11, 12 and 13 provide information on whether interlocked energy companies enjoy an unlawfully favorable credit position.

█ In sum, we agree with the Commission that the information sought by the subpoenas is relevant, and possibly essential, to the FTC's authorized study of the energy industry. Against the weight of the logical connections between the information sought and the specified objectives of the

---

11. A composite subpoena, incorporating all the modifications that have been made to date, is annexed as Appendix B to the FTC's memorandum of law in support of its motion to enforce.

investigation, the respondents' bare argument, that these subpoenas are merely a masquerade beneath which lurks an unauthorized investigation of the banking industry, is altogether unpersuasive.

## Burdensomeness

■ On the issue whether the FTC's demands put an intolerable burden on the respondents,

"if it could be demonstrated that compliance with an agency subpoena would be *unnecessarily* burdensome, some limitation of the the materials required would be warranted. But the burden of showing that an agency subpoena is unreasonable remains with the respondent, see *United States v. Powell, supra,* [379 U.S. 48] at 58, 85 S.Ct. [248] at 255 [13 L.Ed.2d 112] [1964]; *United States v. Donaldson,* 400 U.S. 517, 527, 91 S.Ct. 534, 540 [27 L.Ed.2d 580] (1971), and where, as here, the agency inquiry is authorized by law and the materials sought are relevant to the inquiry, that burden is not easily met." *SEC v. Brigadoon Scotch Dist. Co., supra,* 480 F.2d at 1056. (emphasis in original)

*Accord, FTC v. Texaco,* 555 F.2d 862, 882 (D.C.Cir. 1977); *FTC v. Cockrell, supra,* 431 F.Supp. at 564; *SEC v. Kaplan,* 397 F.Supp. 564, 571 (E.D.N.Y.1975). There is no question that the demands here are for voluminous documentation, requiring a substantial commitment of time and money (see the affidavits attached to Respondents' Rule 9(g) statement). This is to be expected in an inquiry involving the interrelation between two industries of enormous dimension, both of which conduct business of enormous public importance. What amounts to "excess in the breadth of the subpoena" is a matter "variable in relation to the nature, purposes, and scope of the inquiry." *Oklahoma Press Publishing Co. v. Walling, supra,* 327 U.S. at 209, 66 S.Ct. at 506. Against this principle, it appears that the affidavits submitted with the Respondents' Rule 9(g) statement demonstrate nothing more than that, having been charged with a massive undertaking, the

FTC requires information and cooperation commensurate with its task—the burden it imposes is not undue, it is intrinsic to the energy study. In light of the fact that the subpoenas have several times been modified (see, *supra,* n. 11), that the FTC has offered to inspect and copy all requested documents at the respondents' premises, that the respondents have not met the burden of establishing that the imposition created is unnecessary nor that compliance would unduly disrupt or seriously hinder normal operations of their business, and that the respondents have not suggested modifications that would mitigate the burden alleged while providing the information required, we would normally be disposed to grant enforcement forthwith. However, at argument on the motion we recognized that the question of burdensomeness might be deferred for disposition until after the determination of both the Commission's authority and of questions of relevance. Accordingly, disposition of the burdensomeness question will be deferred for a limited period of time to allow submission of affidavits specifying the material objectionable, the alleged burden and any alternative method for obtaining from the banks the information required. The Commission may, of course, answer.

## III.

### Miscellaneous Objections

■ *Confidentiality*: Respondents contend that the subpoenas should not be enforced because they seek confidential information. Such an objection poses no obstacle to enforcement. *FTC v. Tuttle, supra,* 244 F.2d at 616; *accord, FTC v. Green, supra,* 252 F.Supp. at 156. Even if it did, the impediment would be overcome by the protective provisions, which are more than adequate for the purpose of guaranteeing confidentiality.[12] See, *FTC v. Cockrell, supra,* 431 F.Supp. at 564–65.

### Federal Reports Act

■ BankAmerica contends that the subpoenas may not be enforced because they were not reviewed by the Comptroller Gen-

---

12. The FTC ruling instituted the following safeguards:

"The Commission further recognizes that many of the subpoenaed documents may be

eral and, therefore, went out in violation of the Federal Reports Act of 1942, 44 U.S.C. § 3501 et seq. On its face, the reviewing provision of the Reports Act is designed to prevent several agencies from burdening private companies with requests for similar information and is inapplicable to subpoenas, 44 U.S.C. §§ 3512(c), 3502.[13] Since BankAmerica has offered no legal authority to disrupt the absolutely plain language of the Act, we will not abandon common sense.

## Comptroller of Currency

 Citicorp contends that the subpoenas encroach upon the visitorial powers granted to the Comptroller of Currency by 12 U.S.C. §§ 481, 484. This objection is meritless since, by its terms, § 484 permits examinations "such as are authorized by law," and it was held in *Bowles v. Shawano Nat. Bank*, 151 F.2d 749, 751 (7th Cir. 1945) that a subpoena issued by an administrative agency in connection with a lawful investigation constituted just such an examination.

## Venue

BankAmerica's assertion that venue is proper only in the Northern District of Cali-

---

regarded as sensitive business information. Therefore, the Commission has decided to grant your client the following assurances with respect to the contents of all documents responsive to subpoena specifications 3 through 15, inclusive:

1. Pursuant to the Commission's tentative determination of confidentiality, the Secretary of the Commission will deny any request made under the Freedom of Information Act for access to any of the protected documents or to any copies, tabulations, digests, or summaries thereof prepared by the Commission, its staff or consultants.

2. In the event an appeal is taken from the Secretary's denial of such an access request, your client will be promptly notified of the pendency of such appeal and afforded seven days within which to file a written response with the Commission.

3. Thereafter, if the Commission determines that any or all of the documents to which access is sought are not exempt from mandatory disclosure pursuant to the Freedom of Information Act, or that they are exempt but the Commission will exercise its discretion to release them, the Commission will immediately advise your client of its decision and further advise it that the documents will be delivered to the requesting party within five days.

4. The Commission will not release upon its own motion any of the protected documents or their contents to any person outside the employ of the Commission, without first giving your client ten days' notice of its intention to do so."

13. § 3512 requires that the Comptroller review the collection of information, as that term is defined in § 3502, and that administrative agencies clear requests for information with the Comptroller:

"(a) The Comptroller General of the United States shall review the collection of information required by independent Federal regulatory agencies described in section 3502 of this chapter to assure that information required by such agencies is obtained with a minimum burden upon business enterprises, especially small business enterprises, and other persons required to furnish the information. Unnecessary duplication of efforts in obtaining information already filed with other Federal agencies or departments through the use of reports, questionnaires, and other methods shall be eliminated as rapidly as practicable . . .

(c) In complying with this section, an independent regulatory agency shall not conduct or sponsor the collection of information upon an identical item from ten or more persons, other than Federal employees, unless, in advance of adoption or revision of any plans or forms to be used in the collection—

(1) the agency submitted to the Comptroller General the plans or forms, together with the copies of pertinent regulations and of other related materials as the Comptroller General has specified; and

(2) the Comptroller General has advised that the information is not presently available to the independent agency from another source within the Federal Government and has determined that the proposed plans or forms are consistent with the provision of this section . . . ."

"Information," defined in § 3502, does not include material obtained through subpoenas:

" 'information' means facts obtained or solicited by the use of written report forms, application forms, schedules, questionnaires, or other similar methods calling either for answers to identical questions from ten or more persons other than agencies, instrumentalities, or employees of the United States or for answers to questions from agencies, instrumentalities, or employees of the United States which are to be used for statistical compilations of general public interest."

fornia was considered and rejected in the earlier proceedings in the District Court for the District of Columbia (see Transcript of Hearing, April 8, 1976, at 30, 56).

### Counterclaims Under the Freedom of Information Act

By way of counterclaim, Morgan seeks access to "documents in the Commission's possession or control relating to the scope of the 1973 amendment to Section 6 of the FTC Act, upon which the Commission relied in issuing the Subpoena." (¶ 33, Morgan's Answer). Similarly, Chase demands that "the Commission . . . furnish copies of the papers which were filed in opposition to Chase's motion to limit or quash its subpoena duces tecum dated June 10, 1975." (¶ 48, Chase's Answer).

In light of our disposition, it is unnecessary to deal with the counterclaims, or with the motions addressed to them, both of which will be disposed of after conference with the parties. The FTC has moved to strike, or, in the alternative, sever these counterclaims.

### IV.

The motion is granted to the extent of holding that the FTC has authority to issue the subpoenas and that the information requested is relevant to the Commission's inquiry. Furthermore, neither the claims of confidentiality nor the powers of either the Comptroller General or the Comptroller of Currency poses any bar to enforcement. BankAmerica's claim of improper venue is dismissed.

In sum, the only obstacle to enforcement is the unresolved issue of burdensomeness. On that issue, the parties are directed to submit the papers specified, *supra*, at 242, in accordance with a schedule to be formulated at a very early pretrial conference.

As indicated above, after conference with the parties, such action as is necessary will be taken with respect to the counterclaims.

It is so ordered.